FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 APR 12  AM 7: 37

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**RAYMOND ABADIE**                                        **CIVIL ACTION**

**VERSUS**                                                     **NO: 02-2888**

**JO ANNE BARNHART, COMMISSIONER**                    **SECTION: "B"(1)**
**OF SOCIAL SECURITY**

## REPORT AND RECOMMENDATION

Plaintiff, Raymond J. Abadie ("Abadie"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On October 12, 2000, Abadie submitted an application for benefits. He contended that he became disabled on December 31, 1986. R. 184-85. On November 22, 2000, the disability examiner determined that disability was not established. R. 73. On November 22, 2000, Abadie was notified that his application for benefits was denied. R. 75-77. On December 8, 2000, Abadie requested reconsideration. R. 78. On May 3, 2001, the disability examiner affirmed the original

determination that disability was not established. R. 74. On May 7, 2001, Abadie was notified that his request for reconsideration was denied. R. 79-80.

On June 11, 2001, Abadie requested a hearing by an Administrative Law Judge ("ALJ"). R. 81. A hearing was scheduled for December 12, 2001. R. 83-87. Abadie's counsel requested a continuance of the hearing to gather medical records. R. 88. The hearing was rescheduled for February 5, 2002. R. 90-94. A further continuance was requested by new counsel for Abadie, R. 96, and the request was denied. R. 97, 102 and 103. On February 5, 2002, there was a hearing before the ALJ, at which Abadie appeared in proper person. R. 119-34. A further hearing was held on March 26, 2002, at which Abadie appeared in proper person. R. 135-143. On April 26, 2002, Abadie's claim was dismissed.[1] R. 151-57.

On May 29, 2002, Abadie appointed Edward Cloos as his attorney representative. R. 28. On June 13, 2002, Cloos argued to the Appeals Council that res judicata was improperly applied to dismiss Abadie's claim. R. 113-15. On August 20, 2002, the Appeals Council denied the request for review. R. 118. On September 19, 2002, Abadie filed the complaint in this Court. Rec. doc. 1. On March 17, 2003, the District Court granted the Commissioner's unopposed motion to remand. Rec. doc. 7. On April 16, 2003, the Appeals Council referred to the Court's order of remand and assigned the claim to an ALJ for hearing with the requirement that the ALJ address whether Abadie was under a "disability" that commenced on or before December 31, 1987, the last date on which Abadie was insured. R. 144-45.

---

[1] The basis of the dismissal was res judicata. The Commissioner's computer records indicated that Abadie submitted an earlier claim and that there were hearings before ALJs on August 31, 1988 and June 30, 1992, with decisions issued after both hearings. R. 33. Abadie contended that these did not occur. R. 32. The Commissioner was not able to produce copies of the decisions. Abadie submitted an affidavit in which he reported that a 1988 application for benefits was denied. He asserted that he was told that he would have to exhaust his personal assets before he was eligible for benefits and he was not advised of the potential effect of res judicata on his application. R. 117.

2

On December 22, 2003, there was a hearing before the ALJ at which Abadie and a vocational expert testified. R. 30-72. On February 27, 2004, the ALJ issued an unfavorable decision. R. 15-25. On March 12, 2004, Abadie requested that the Appeals Council review the ALJ's decision. R. 7-11. On July 21, 2004, the Appeals Council denied this request. R. 4-6.

On October 25, 2004, Abadie's motion for a scheduling order in the federal court proceeding was granted. Rec. docs. 8 and 9. On November 9, 2004, the Commissioner answered. R. 10. On January 10, 2005, Abadie filed his motion for summary judgment. Rec. doc. 13. On February 17, 2005, the Commissioner filed a cross-motion for summary judgment. Rec. doc. 14. The matter is submitted on the cross-motions for summary judgment.

## STATEMENT OF ISSUES ON APPEAL

After carefully reviewing Abadie's motion for summary judgment, the undersigned finds that his request for judicial review raises the following issues:[2]

    a.    What is the period that is at issue in Abadie's claim?

    b.    Did the ALJ properly consider the opinion of Abadie's treating physician, Bruce Razza, M.D., an orthopedic surgeon?

    c.    Was the ALJ bound by the expert testimony of the vocational expert?

    d.    Did the ALJ err with respect to his finding concerning Abadie's race horse business?

    e.    Did the ALJ err in finding that Abadie's allegations concerning his limitations were

---

[2]   On October 25, 2004, Abadie was ordered to file a motion for summary judgment in accord with the requirements of the original scheduling order. Rec. doc. 9. That order provided that Abadie's memorandum was to include a statement of errors. The order specified that:

   This statement shall set forth in separate numbered paragraphs the specific errors committed at the administrative level that entitle plaintiff to relief. The Court will consider only those errors specifically identified.

Rec. doc. 2. Abadie failed to comply with this requirement.

not totally credible?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits only through December 31, 1987.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's Lumbar Spondylosis is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4.  This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity to:  lift and carry 20 pounds occasionally and 10 pounds frequently; push and pull within the limits of lift and carry; stand and walk for 6 hours and sit for 6 hours out of an 8 hour day; occasionally engage in all postural movements with the exception of never climbing ladders, ropes and scaffolds; manipulate, see, communicate and work in all environments without difficulty.

7.  The claimant's past relevant work as a Buyer and Seller of horses and a Salesman did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

8.  The claimant's medically determinable Lumbar Spondylosis does not prevent the claimant from performing his past relevant work.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

R. 24-25.

## ANALYSIS

a.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically

5

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations that provide

procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599

& appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process

for determining whether an impairment prevents a person from engaging in any substantial gainful

activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d

232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[3]  The five-step inquiry

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v.

Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

---

[3]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

      b.      Testimony at hearing before ALJ.

At the time of the hearing Abadie was 56 years old. R. 41. He received Supplemental Security Income benefits of $88.35 a month. R. 59. He was married. R. 41. He had completed the twelfth grade. R. 41. He attended college for one and half years and then training at Delgado in drafting. R. 41. He served in the Marine Corps and was honorably discharged for medical conditions in July 1968. R. 42. Abadie was seeking a disability rating from the military. R. 42.

After his discharge Abadie worked as an electrician for four to five years doing commercial work. R. 48-49. He then started in the carpet business as an employee at Carpet World. R. 49. He left there and became a carpet buyer for Universal Furniture for about two years. R. 49. From 1978 through 1981 Abadie owned and operated a retail floor covering store that provided flooring to the New Orleans Hilton and portions of the Superdome. R. 41, 51 and 52. In the 1980s Abadie "fooled with race horses." R. 52. He also tried to resume the carpet business, but his back problems limited him. R. 52. He was first hospitalized for a heart problem was in 1985. R. 56. He was on

7

nitroglycerin three times a day. R. 58.

One evening in 1987, he was leaving Jefferson Downs after a race, when the lights were turned out prematurely, he fell into an open manhole. R. 52. He received $750,000 on his claim against Jefferson Downs. R. 60.[4]  After this surgery there were a lot of complications. R. 53. Dr. Razza performed a second operation in March 1988. R. 53. Dr. Razza never released Abadie to return to work. R. 59. Dr. Razza told him that he could not do any bending, crouching, stooping or lifting. R. 61. He could not sit for more than 15 minutes. He wanted him to lie down. R. 61. Later he was restricted to walking no more than two or three blocks and not lifting more than five pounds. R. 61. From 1987 through 1994 he was continued on narcotic pain medications. R. 59. He last worked in 1987. R. 43.

From March of 1989 through the end of 1990, Abadie and his wife invested in race horses. R. 46-47. They purchased and resold the horses. He was required to travel. Because of his heart condition, he had to stop. R. 46-47. Abadie testified that he could do most of the work on the investment in horses by phone, but he also wanted to travel to see the horses. R. 55-56.

In 1992 and 1993, he and his wife formed a partnership with a company called Taylor to open a restaurant. Because of a problem with equipment from Taylor, the restaurant closed and Abadie's investment was returned. R. 45-46.

In 1994, Abadie had a cervical fusion. R. 59.

In 1997 and 1998, Abadie was a participant with his wife and son in Abadie Enterprises that purchased three homes in Florida and renovated them for resale. R. 44. Abadie was involved in

---

[4] By the time of the hearing the money was gone. R. 60. Dr. Razza operated on his back in 1987 after the accident. R. 53.

decision making in this business for about six to eight months. R. 45.

In 2000, Abadie had a second cervical fusion. R. 59. Abadie took a treadmill test about three months before the hearing, which had a good result. R. 57. He reported that he had had a quadruple by-pass, three stent operations, and two strokes. R. 57.

The ALJ asked that additional records be provided regarding Abadie's medical treatment, including any information from Dr. Razza on Abadie's limitations in 1988 and 1989. R. 61-62. He also requested the tax returns for the years that Abadie was involved in business ventures after 1987. R. 63.

The ALJ described limitations for the vocational expert which the expert found permitted a relatively full range of sedentary work with some encroachment on the light work. R. 67. The expert testified that he could not return to his past relevant work. R. 67.

c.     Summary of Medical Evidence.

There are no contemporaneous medical records regarding Abadie's medical history prior to November 12, 1987. In the histories that he provided to his treating physicians he reported that the problems with low back pain began by 1967 when he had a laminectomy. R. 637. He had lower lumbar neurosurgery in 1982. R. 637 and 726. He was totally asymptomatic until the October 3, 1987 accident at Jefferson Downs. R. 637. In May 1986, Abadie was evaluated for symptoms compatible with unstable angina. R. 608. There was a cardiac catheterization at East Jefferson General Hospital ("East Jefferson") which revealed no significant coronary artery disease. R. 608. He did not have further significant chest pain until April 5, 1990. R. 608.

On November 12, 1987, Abadie reported to Bruce Razza, M.D., an orthopedic surgeon, that

9

he was injured on October 3, 1987 when he fell into an open manhole.[5]  He complained that he aggravated his pre-existing back condition and there was increased pain in his back and legs. The impression was probable symptomatic lumbar spondylosis with bilateral radiculopathy. R. 288. After additional diagnostic testing, he was admitted to St. Charles General Hospital ("St. Charles General") for surgery on December 14, 1987. R. 724. He reported cardiac disease which caused chest pain. R. 726. The surgery included lumbar laminotomies and fascetectomies from L-3 to the sacrum, discetomy at L4 and L-5, installation of fixation devices, fusion at L-4 to the sacrum and bone grafts. R. 773. He was discharged on December 18, 1987 in stable condition with appropriate activity restrictions. The post-operative course was unremarkable. The final diagnosis was lumbar spondylosis. R. 724-25.

On December 29, 1987, Dr. Razza reported that Abadie was about two weeks post operative. He was doing extremely well. He was not taking any pain medication. He had no back pain. The wounds were healing well. There was mild muscle spasm and restricted range of motion. Dr. Razza anticipated that it would take a year for Abadie to reach maximum medical improvement. R. 289. On January 26, 1988, he reported no back pain, but some intermittent left leg pain. R. 291. On February 25, 1988, he reported to Dr. Razza that two weeks earlier he began to experience persistent left leg pain. A straight leg raising test was positive for pain. The diagnosis was recurrent sciatica in the left lower leg. The cause was undetermined. R. 290. On February 29, 1988, Abadie reported that since the December 1987 surgery the pain in his low back reappeared but was very slight. His main problem was continuous pain in the left lower leg. R. 639. The impression was a possible

---

[5] The medical records indicate that Dr. Razza provided treatment to Abadie prior to this incident. Presumably this was for the 1982 lumbar surgery.

10

failed lumbar fusion. R. 642.

On March 14, 1988, Abadie was admitted to St. Charles General for surgery, which was done by Dr. Razza. The surgery included exploration and decompression at L-4, L-5 and S-1, a partial discetomy at L5-S1 and a complete laminectomy at L-5. R. 636 and 664. The post-operative course was unremarkable.   R. 637.  He was discharged from the hospital in stable condition with appropriate activity restrictions. R. 638. On March 25, 1988, Dr. Razza reported Abadie was doing well. He no longer had the left leg pain. His back was doing well. The wound was healed and there were no signs of infection. He was not taking any pain medication and none was prescribed. R. 291. There are no further contemporaneous records of treatment by Dr. Razza until February 18, 1994. See R. 354-57. A December 11, 2003 report by Dr. Razza stated that he continued to treat Abadie after the March 1988 surgery and that on some visits he reported he was free from pain while on other visits he reported debilitating pain. R. 911-13.

On August 30, 1988, Abadie was admitted to Doctors Hospital of Jefferson ("Doctors Hospital") with complaints of crushing left chest pain.  He improved rapidly and was discharged. The diagnosis was chest pain from an undetermined cause. R. 172 and 625–27. On September 30, 1988, he returned to Doctors Hospital for two days and was diagnosed with an acute viral inflammation of the inner ear from an undetermined cause. R. 171 and 622.

There are no medical records for 1989.

On April 26, 1990, Abadie was admitted to Doctors Hospital for three days.  The chief complaint was chest discomfort. R. 165. Abadie reported that on April 5, 1990, he experienced chest heaviness and dizziness. R. 608. He took Vicodin and resumed his activities at the race track. After driving to Arkansas he had further problems. R. 608. An angiogram revealed significant

lesions at the bifurcation of a diagonal artery.  R. 608.  Occlusions were noted.  R. 608.  The diagnosis was unstable angina, recent anterior myocardial infarction and single vessel coronary artery disease.  A catheterization, coronary arteriography and angioplasty were performed.  He was discharged in good condition.  He was placed on mild restrictions for a week after which he could resume his usual activities.  R. 163-64.  On October 29, 1990, Abadie was seen at a VA facility where he complained that it felt like he had a heart attack.[6]  R. 497.  He reported pain since August 1990.  R. 498.

On February 21, 1991, he reported that he had a heart attack in January 1991 and was treated at East Jefferson.[7]  R. 499.  On February 26, 1991, Abadie was seen at the VA Hospital with complaints of pain in his back, neck and left arm.  R. 484-85.  A cervical x-ray revealed mild scoliosis and degenerative spurring of C-4.  R. 495.  On March 21, 1991, Abadie was admitted to the VA Hospital with complaints of heavy chest pain that occurred while he was standing in line at a grocery store.  R. 442-46 and R. 580.  A chest x-ray revealed possible scarring.  R. 493.  Oxygen therapy was performed.  R. 570.  On March 23, 1991, he signed out of the hospital against medical advice.  R. 595.  On March 28, 1991, he returned to the VA Hospital  with complaints of chest pain.  R. 552.  He was discharged on March 30, 1991 with a diagnosis of chest pain, coronary artery disease and hypertension.  A cardiac catheterization was performed.  R. 555 and 560-61.  His condition was stable at discharge.  R. 567.  On April 29, 1991, a stress test was performed.  The findings were consistent with the scar from a previous infarction involving the interior wall and

---

[6] The records from the Veterans Administration do not always indicate the location of the VA facility where Abadie received treatment.  The records indicate that he received treatment at the VA Hospital in New Orleans ("VA Hospital"), a VA facility in Las Vegas, Nevada and a VA or military facility in Florida. Where the location is not evident from the records, it is referred to as a VA facility.

[7] There are no records of this treatment at East Jefferson General Hospital.

apex. R. 491.

On November 4, 1992, Abadie was seen at a VA facility.  He reported that he strained muscles in his chest and back muscles after lifting something heavy.  Before this he was not experiencing any problems. R. 369 and 412.

On January 19, 1993, Abadie was seen at the VA Hospital with a report that he twisted his low back several days before and had low back pain.  He was not in acute distress.  The diagnosis was low back pain with exacerbation secondary to low back strain. R. 409 and 411.  On March 16, 1993, a cardiologist in Nevada, Dr. Karen Arcotta, performed a catheterization with an aortogram and selective venous graft injections. R. 438-41

On February 18, 1994, Dr. Razza performed surgery on Abadie's neck from C-3 through C-6 with a fusion and a plate.  The operative report indicates that in March, 1993, Abadie injured himself when he was shocked on a copper coiling line connected to a Daiquiri machine.  Abadie was thrown back and fell against a fire extinguisher which also fell on him.  He experienced progressive intractable cervical pain.[8]  R. 354-57.  On April 13, 1994, Abadie reported to a VA facility that he was feeling fine and had no complaints. R. 473 and 477.

On June 29, 1995, Abadie reported to Dr. Razza improvement after surgery.[9]  He only experienced intermittent neck and arm pain.  There was no report of low back pain. R. 287.

On September 25, 1995, Abadie went to an emergency room in Nevada for atypical chest pain.  Abadie and the doctor concluded it was likely gastrointestinal in nature and he went home the

---

[8] There are no record from Dr. Razza for office visits immediately before or after this surgery.

[9] It is not clear which surgery is the subject of the note.  Presumably it refers to the surgery on February 18, 1994.

13

same day. R. 526-41. On September 26, 1995, Abadie called a VA facility to report that he had chest pain. He was advised to seek treatment at an emergency room. R. 404.

On November 9, 1995, Abadie was seen by Dr. Razza, who reported increased pain in the neck, right arm and low back. Surgery was recommended for long term improvement. R. 286. On November 22, 1995, Abadie was seen at the VA Hospital for a report of low back pain. He was to return in six months. R. 399-400.

On April 9, 1996, Abadie telephoned Dr. Razza with reports that the pain was significantly worse and there was dizziness associated with it. R. 285. On June 20, 1996, he was seen by Dr. Razza for ongoing chronic neck pain radiating down into the right arm. Dr. Razza recommended surgery. R. 284. On October 1, 1996, he returned to Dr. Razza and reported that the pain in his arm was becoming worse. Abadie planned to see a specialist in Las Vegas. Dr. Razza reported marked guarding of the upper right extremity. There were positive findings at C-6. R. 283. On April 10, 1997, he was seen by Dr. Razza with complaints of right arm pain, weakness, dysfunction and lack of use. The neurologic examination found further deterioration in the cervical spine. The impression was chronic cervical radiculopathy with symptoms into the upper right arm. There was no report of back pain. R. 281.

On May 13, 1997, Abadie was seen at a VA facility for a cardiology appointment. He reported heart palpitations and chest tightness. R. 377-78. On June 11, 1997, Abadie had an electrocardiogram in Nevada. The resting EKG was abnormal. The conclusion was non-diagnostic with minor resting electro-cardiographic abnormalities, minor non-specific changes with exercise and no definite ischemia. R. 436. A further diagnostic test was positive for minimal peri-infarction ischemia of the anterior, apical and inferior walls. R. 437. On August 21, 1997, Abadie was seen

at a VA facility in Nevada for a cardiology appointment. He reported chest pains. R. 375-76. On August 29, 1997, Abadie was seen at a VA facility in Nevada for blood in his urine, back pain and fever. Kidney stones were suspected. R. 543.

On March 20, 1998, Abadie was admitted to a VA facility in Florida with complaints of headaches. The tests were negative for a stroke. R. 515. A Doppler study of the carotid arteries revealed mild stenosis. A CT scan of the brain was normal. After his admission he began to complain of cervical pain. R. 517. He was discharged on March 24, 1998. R. 517. On May 8, 1998, there was a MRI of the cervical spine that revealed a fusion from C-3 through C-7. Spondylosis was seen at C-7. C-2 appeared unremarkable. R. 328. On September 15, 1998, there was a treadmill test where he reached 95% of maximum predicted heart rate. There was no chest pain. The EKG was negative. R. 351-52.

On December 18, 1998, Abadie was seen at the VA Hospital. He complained of pain following an automobile accident on September 22, 1998. The chief complaint was right arm pain. R. 292-93. He was seen for a follow-up after a nerve block done the week before.[10] Abadie reported that he still had discomfort in the right neck and right shoulder area. He complained of recurrent low back pain that radiated into the right leg. R. 324.

On March 2, 1999, he reported to Dr. Razza that he was injured on September 22, 1998, when he was rear-ended while riding as a passenger in the rear seat of a car. He complained of pain in the right arm and severe neck pain. R. 278. On April 27, 1999, Dr. Razza noted that there was no relief from an epidural and a second could not be done because of scar tissue. R. 277. On May 17, 1999, Dr. Charles Aprill, a radiologist, performed a selective left epidural injection. The initial

---

[10] There are no records of this procedure.

15

response was favorable with marked improvement. R. 345-49.  On May 24, 1999, Abadie reported to Dr. Razza that he was in some distress with pain in the neck and shoulder. R. 277.  On August 10, 1999, he reported to Dr. Razza that he was in excruciating pain in his low back, right arm and neck. R. 275.

On August 30, 1999, Abadie was seen by K. E. Vogel, M.D., a specialist in neurologic surgery, for pain in the neck, right arm, low back and left leg on a referral from Dr. Razza.  Abadie reported that he was progressing satisfactorily until he was rear-ended on September 22, 1998.  He was treated conservatively.  He reported that prior to the September 22, 1998 incident he had resolved his lumbrosacral pain and 90 percent of his cervical pain.  He was not able to resume his normal duties of remodeling houses since the September 22, 1998 incident.  He was not in acute distress.  The diagnosis was intractable cervical and lumbrosacral pain of unknown cause. R. 341-44.  In September and December 1999, Abadie was seen by Drs. Razza and Vogel.  He reported to them that he was in a great deal of pain. R. 274, 275 and 340.

On January 4, 2000, Dr. Vogel recommended a lumbar epidural injection and an anterior cervical fusion with anterior plating. R. 338-39.  On January 12, 2000, he performed the fusion.  A prior plate was removed and a new plate was installed. R. 336, 504-07 and 897-99.  On February 14, 2000, Abadie reported to Dr. Vogel that he was experiencing mild pain in the neck and right arm and pain in the low back and left leg. R. 334.  On March 21, 2000, Abadie was seen by Dr. Vogel for pain in the neck and upper left arm. R. 333.  In April and May 2000, he reported to Dr. Vogel that he had pain in the neck, right arm and hand. R. 331-32.  On May 15, 2000, Abadie underwent a cervical facet block with pain relief for more than eight hours. R. 308.  Dr. Vogel reported that Abadie's pain was related to the September 28, 1998 incident.  He recommended a cervical branch

16

neurotomy.  R. 271.

On May 17, 2000, Abadie reported to Dr. Vogel that he was in good health until he was hospitalized in January 12, 2000 for an anterior cervical fusion with a plate.  He was fine following the surgery until about three months after the surgery.  At that time he experienced pain in the neck and right arm which had persisted.  He had not returned to his normal duties.  R. 307.  On May 18, 2000, Abadie was admitted to Memorial Medical Center (Mid-City Campus) for a cervical branch neurotomy.  The disability was estimated at three to six months.  R. 270, 306, 309-10.  On June 27, 2000, Dr. Vogel reported that Abadie was experiencing mild cervical pain, mild right arm pain, mild burning and swelling in the right hand, moderate low back pain and moderate pain in the left leg. R. 269.  On October 2, 2000, Dr. Vogel saw Abadie for low back and leg pain, burning of the legs and numbness of the feet.  Abadie experienced an increase in the burning sensation and swelling of the right hand.  He reported that 75 percent of the cervical pain was resolved.  He was continued on conservative care.  R. 267.

On April 3, 2001, Abadie was examined by Olga Penaherrera, M.D., a family practitioner, at the request of the Commissioner.  R. 879-89.  Abadie reported that his last employment was in 1998.  He alleged disability because of cervical and lumbar fusions, heart problems and a stroke. R. 879.  The cervical problems began in 1993.  R. 879.  The history for the lumbar fusion began in 1987.  R. 880.  Abadie reported that his first stroke occurred in 1987, when he was in the hospital for a lumbar fusion.  R. 880.  A second stroke occurred in 1998.  R. 880.  The heart problems began in 1981 with chest pains.  R. 880.  The physical examination described him as well-developed and well-nourished.  R. 883.  The examination of the cervical spine revealed some muscle tenderness but no bony deformities.  The range of motion for the neck and back produced some pain but no spasms.

17

The straight leg test was positive. R. 884. The neurological examination did not reveal any muscle weakness or muscle atrophy. There were no sensory deficits and reflexes were intact. R. 885. There was no disturbance in the gait. Abadie had no difficulty walking. There was no limp. R. 885. Dr. Penaherrera reported that some definitive functional limitations should be considered secondary to his cervical and lumbar pain. The only deficit from the stroke was some decreased weakness in the right arm. His heart condition also required some definitive functional limitations. R. 887.

d.      Other Evidence.

A portion of Abadie's 1989 income tax return reported income of $154,193 from horse racing with expenses of $166,957 for a loss of $12,764. R. 206. Abadie and his wife filed a joint income tax return for 1999. The only income was a capital gain of $54,263. R. 198-205. The source of the gain was the sale of two properties in St. Petersburg, Florida. R. 202. Abadie and his wife filed a joint income tax return for 2001. The only income was a capital gain of $41,973. R. 191-197. The source of the gain was the sale of a house and lot in Florida. R. 193.

e.      Plaintiff's Appeal.

Issue no.1.      What is the period that is at issue in Abadie's claim?

Abadie's claim is unusual. Because of its procedural history, the application at issue was not filed until October 12, 2000. It sough disability insurance benefits for the period from one year prior to the application and continuing forward. The basis of the claim is that Abadie became disabled on or before the date on which he was last insured (December 31, 1987) and remained disabled through the date of the ALJ's decision (February 27, 2004). Thus, Abadie's medical history from 1987 through February 27, 2004 is pertinent. As a threshold matter, Abadie must prove that he became disabled by December 31, 1987 and that his disability continued for twelve months

18

thereafter. Abadie fell in the open manhole on October 3, 1987. R. 288. He contends that he became disabled on that date and he was disabled for twelve months thereafter through November 1988. The ALJ found that:

> [T]he medical evidence does not establish the existence of a severe cardiac condition nor does it establish that the claimant's muscoloskeletal condition was disabling for 12 consecutive months [following the injury to his back].

R. 22. Abadie contends that the ALJ's analysis of the evidence was grossly deficient. The medical evidence must be examined to determine what it reveals concerning Abadie's condition for the twelve months following the October 3, 1987 injury to Abadie's back.

Issue no. 2.    Did the ALJ properly consider the opinion of Abadie's treating physician, Bruce Razza, M.D., an orthopedic surgeon?

Dr. Razza was Abadie' treating orthopedic surgeon following the October 3, 1987 accident. The earliest treatment note for Dr. Razza is dated November 12, 1987. It begins, "[p]atient returns today after considerable absence from the office." Rec. doc. 288. This indicates that Dr. Razza treated Abadie previously and perhaps for the lower lumbar neurosurgery in 1982. There were other absences in Abadie's contact with Dr. Razza. Abadie was seen by Dr. Razza on March 25, 1988. R. 291. The next contemporaneous record is six years later for an operative report for surgery on Abadie's neck on February 18, 1994. R. 354-57. More than a year later Abadie was seen by Dr. Razza on June 29, 1995. R. 287. Abadie telephoned his office on September 7, 1995 and visited him on November 9, 1995. R. 286-87. In 1986 there were three visits on April 9, June 20 and October 1. R. 283-85. In 1987 there were two visits on April 10 and October 28. R. 280-81. There are no records of treatment by Dr. Razza for 1998. Dr. Razza saw Abadie regularly from March 2, 1999 until he was referred to Dr. Vogel in August 1999. R. 278 and 341-44.

After the hearing before the ALJ, Abadie obtained a three page report from Dr. Razza dated December 11, 2003. R. 911-13. Abadie notes that the ALJ failed to mention this report in his decision and contends that the ALJ failed to give proper weight to Dr. Razza's opinion. Dr. Razza's December 11, 2003 report refers to the surgeries that he performed on Abadie in December 1987 and March 1988 and states:

> Following the March 1988 surgery, Mr. Abadie had a significant improvement in his lumbar spine pain, as the intractable sciatica ceased. He continued, however, to have significant periods of exacerbation of pain. On some office visits he would report being virtually free from pain, while a month or two later the pain would be debilitating. This is not an unusual presentation for a patient who has had multiple major spinal operations.

R. 911. The record for March 25, 1988, demonstrates that Abadie was doing well following the second surgery. He had no pain in the left leg. His back was doing well. He was not taking any pain medication and none was prescribed. R. 291. Dr. Razza's statement that Abadie continued to have significant periods of exacerbation of pain is not supported by the contemporaneous medical records, because there are no records of further contact with Dr. Razza until February 1994.

The medical records contain some information that is not consistent with Dr. Razza's recollection. In August of 1988 when Abadie sought treatment for chest pain, he reported some leg pain. R. 626. There was no report of back pain after the March 1988 surgery until February 1991, when Abadie complained of pain in his back, neck and left arm at a VA facility. R. 484-85. The next report of low back pain was in January 19, 1993. R. 409-411. In February 1994, Dr. Razza operated on Abadie's neck. R. 354-57. On April 13, 1994, Abadie reported he was feeling fine and had no complaints. R. 473. In November 1995, Abadie reported increased pain in his neck, right arm and low back. R. 286 and 399-400. In 1996 he reported increased neck pain. R. 283-85. In

20

1987 Abadie reported pain related to his cervical condition. He did not report low back pain. R. 280-81. On September 22, 1998, Abadie was injured in an auto accident. R. 278. He reported to Dr. Vogel that prior to the accident he had resolved his lumbrosacral pain and ninety percent of his cervical pain by mid 1994. R. 336 and 341-44. These medical records demonstrate that there were substantial periods were Abadie did not have any low back symptoms and that sometime prior to September 1998 the low back symptoms were completely resolved. Under these circumstances, the best that can be said is that after fifteen years, Dr. Razza's recollection was unreliable.

Dr. Razza's report of December 11, 2003 also placed significant limitations on Abadie's activities. He reported that, due to the cervical and lumbar problems, Abadie's tolerance for sitting was reduced in that he could not sit in an ordinary straight back chair for more than two to three hours in a day or stand for more than two hours in a days. He needed to alternatively sit, stand or lie down throughout the day in order to remain relatively comfortable. Extended periods in any position were intolerable. R. 912-13. The first difficulty with this statement is that it does not address Abadie's limitations for the year following the October 1987 accident.[11] By coupling the lumbar and cervical problems Dr. Razza is referring to a time after the onset of Abadie's cervical problems, Dr. Razza reports that the first complaint of neck pain was in May 1989. The undersigned has not been able to find any contemporaneous record for any treatment for Abadie in 1989 by Dr. Razza or any other provider. Assuming that Abadie did seek treatment in 1989 for neck pain, this did not occur within the twelve months following the October 1987 accident. The earliest medical evidence in the record of a report of pain in the cervical region was in February 1991. R. 484-85.

---

[11] The ALJ specifically asked Abadie's attorney to obtain information from Dr. Razza's on Abadie's limitations after the March 1988 surgery. R. 61.

There are reports in the medical records that are inconsistent with Dr. Razza's description

of Abadie's limitations. In April 1990, Abadie experienced chest heaviness. After taking pain

medication, he drove from New Orleans to Arkansas. R. 608. On November 4, 1992, he reported

that he strained the muscles in his chest and back after lifting a heavy object. R. 412. The February

18, 1994 neck surgery was prompted by injuries he sustained when he was shocked by a copper tube

connected to a daiquiri machine. R. 354-57. There was no explanation for what Abadie was doing

with this machine. Abadie related to Dr. Vogel that, prior to the September 22, 1998 auto accident,

he was in the house remodeling business and that since the accident he was not able to resume his

"normal duties remodeling houses. . . ." R. 341. It appears that the limitations described by Dr.

Razza must relate to the time in 1999 when he referred Abadie to Dr. Vogel.

In Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit stated:

> Even though the opinion and diagnosis of a treating physician should be afforded
> considerable weight in determining disability, the ALJ has the sole responsibility for
> determining a claimant's disability status. The ALJ is free to reject the opinion of
> any physician when the evidence supports a contrary conclusion. The treating
> physician's opinions are not conclusive. The opinions may be assigned little or no
> weight when good cause is shown. Good cause may permit an ALJ to discount the
> weight of a treating physician relative to other experts where the treating physician's
> evidence is conclusory, is unsupported by medically acceptable clinical, laboratory,
> or diagnostic techniques, or is otherwise unsupported by the evidence.

Id. at 455 (citations, quotation marks and brackets omitted). See also Scott v. Heckler, 770 F.2d

482, 485 (5th Cir. 1985). Because of the shortcomings in Dr. Razza's December 11, 2003 report, the

ALJ was not required to give it controlling weight.

Dr. Razza stated that he considered Abadie to be totally disabled from 1987 through 1999.

R. 913. This is an opinion on an issue reserved to the Commissioner, so the ALJ was not required

to follow it. 20 C.F.R. § 404.1527(e). The ALJ did not err in failing to give controlling weight to

the opinion of Dr. Razza as expressed in his letter of December 11, 2003.

Issue no. 3.       Was the ALJ bound by the expert testimony of the vocational expert?

The ALJ found that Abadie retained a residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, push and pull within the lift and carry limits, stand and walk for 6 hours, and sit for 6 hours out of an 8 hour day. R. 23. He could occasionally engage in all postural movements. He could not climb ladders. He could manipulate, see, communicate and work in all environments without difficulty. R. 23. Based on these findings the ALJ found that he could perform his past relevant work as a salesman. R. 23. The Appeals Council reported that the position of salesman could be performed based on the assessed residual functional capacity and the past relevant work. R. 5.

At the hearing the ALJ obtained testimony from a vocational expert. The expert described the position of salesperson for floor coverings as light. R. 64. By Abadie's testimony, the position would come up as a heavy classification. R. 65. Abadie's disability report, however, indicated that as a carpet salesmen the heaviest weight he lifted was less than ten pounds and the weight that he frequently lifted was less than ten pounds. He described these as carpet samples. R. 240. At the hearing the ALJ described Abadie's limitations as being able to lift and carry ten to fifteen pounds occasionally and frequently lighter weights. He would also be able to sit, stand or walk at least six hours in a day alternating positions. R. 66. The expert described this as a full range of sedentary work with some encroachment on light work. R. 66. Under these limitations the expert testified that Abadie could not perform his past relevant work either as described in the testimony or as found in the national economy. R. 67.

Abadie contends that the ALJ's description of the residual functional capacity in the decision

23

is different from what was presented to the vocational expert. This is correct. In <u>Owens v. Heckler</u> 770 F.2d 1276 (5th Cir. 1985), the claimant contended that the ALJ arbitrarily ignored the testimony of the government's vocational expert. The Fifth Circuit stated:

> [T]he ALJ explained the expert's opinion was irrelevant because it was based on a hypothetical question composed of assumptions subsequently found unsupported by medical evidence. . . . Because . . . [the ALJ] found objective medical evidence did not coincide with the hypothetical assumptions posed to the vocational expert, the ALJ reasoned the expert's opinion was immaterial. In light of this explanation, and acknowledging that the findings as to pain and limitation are supported by substantial evidence, we find rejection of the expert testimony reasonable.

<u>Id</u>. at 1282. The issue is whether the ALJ's description of the residual functional capacity in the decision is supported by substantial evidence.

A week after the second lumbar surgery on March 14, 1988, Abadie reported he was doing well and there was no pain in the back or his left leg. He was not taking pain medication and none was prescribed. R. 291. There were no further reports to Dr. Razza of back or leg pain throughout 1988. When Abadie sought medical attention on August 29, 1988 for the crushing left chest pain, a physical examination was unenlightening. There is no mention of back pain. R. 172. The admission record refers to Vicodin as home medication and reports left leg pain. R. 626. He returned to the hospital on September 30, 1988 with the abrupt onset of severe dizziness, nausea, vomiting and diarrhea and temperature elevation. The examination found no significant abnormalities. The only pain reported was chest pain. R. 622. He was discharged with a diagnosis of an acute viral infection of the inner ear. R. 622. Based on these medical records, there is substantial evidence to support the finding that before the expiration of twelve months after the October 1987 accident, Abadie retained the residual functional capacity as described in the ALJ's decision. The ALJ did not err in ignoring the testimony of the vocational expert.

24

<u>Issue no. 4</u>.     Did the ALJ err with respect to his finding concerning Abadie's race horse business?

The ALJ's decision indicates that Abadie owned and operated a horse racing business in 1988. R. 19. Abadie disputes this finding. He submitted his income tax return for 1989 which indicates that he was in the race horse business in 1989. R. 206. The error was not prejudicial to Abadie.[12] The only significance of the race horse business was that the ALJ described this as his past relevant work in addition to his work as a salesman. R. 24.  The Appeals Council acknowledged the ALJ's error and found that the position of buyer and seller of race horses was not performed by Abadie until after his date last insured (December 31, 1987), so it was not past relevant work.  The Appeals Council noted that the ALJ's decision was not based on a finding that Abadie had engaged in substantial gainful activity within twelve months of the October 1987 accident. R. 5.

<u>Issue no. 5</u>.     Did the ALJ err in finding that Abadie's allegations concerning his limitations were not totally credible?

The ALJ found that it was reasonable to assess some functional restrictions but not to the extent indicated by Abadie. R. 23.  The ALJ said:

> [I]n reference to SSR 96-7p, the undersigned finds that the claimant's allegations of functional deficits and pain are not fully substantiated by the medical and non-medical evidence and are therefore only partially credible.

R. 23.  Abadie testified that he was restricted from lifting more than five pounds. R. 61.  This statement is contradicted by the medical records, in which he reported in November 1992 that he strained his back muscles while lifting a heavy object. R. 412.  Either Abadie was not restricted from lifting more than five pounds or he ignored those restrictions in November 1992.  Abadie

---

[12] Abadie's testimony at the trial may bear some of the responsibility for the error.  He testified that in the 1980's he "fooled" with race horses. R. 52. On the evening of the October 1987 accident he was at the race course with a horse that was racing.  R. 52.

testified that he was on narcotic pain medication from 1987 through 1994.  On December 29, 1987

Dr. Razza reported that Abadie was not taking any pain medication.  R. 289.  On March 25, 1988,

he reported that Abadie was not taking any pain medication and none was prescribed.  R. 291.

Abadie testified that his significant heart problems began in 1987.  This is not consistent with the

medical records.  The medical records reveal that there was a cardiac catheterization in May 1986,

but it did not reveal any significant coronary artery disease.  R. 608.  He complained of chest pain

on August 30, 1988, but he improved rapidly and was discharged.  The diagnosis was chest pain of

undetermined origin.  R. 627.  In April 1990, he was admitted to the hospital for three days and a

catheterization and angioplasty were performed.  R. 163-64.  In the history that Abadie provided he

reported to the physicians that from the catheterization in May 1986 until April 1990 he did not have

any significant chest pain.  R. 608.  There is substantial evidence to support the ALJ's finding that

Abadie was only partially credible.


## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's motion for summary judgment (Rec.

doc. 14) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 13) be DENIED.


## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and

recommendations in a magistrate judge's report and recommendation within ten (10) days after being

served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal

the unobjected-to proposed factual findings and legal conclusions accepted by the district court,

26

provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 11th day of April, 2005.

SALLY SHUSHAN
United States Magistrate Judge